**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **JENNIFER RIPLEY** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 12 C 9462 |
| | ) | |
| v. | ) | |
| | ) | Magistrate Judge Daniel G. Martin |
| **CAROLYN COLVIN,** | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Jennifer Ripley ("Plaintiff" or "Ripley") seeks judicial review of a final decision of Defendant Carolyn Colvin, the Commissioner of Social Security ("Commissioner"). The Commissioner denied Plaintiff's application for Disability Income Benefits ("DIB") and Supplemental Security Income Benefits on April 19, 2011. The Appeals Council denied review, and Ripley filed a Motion for Judgment on the Pleadings to reverse the ALJ's decision. The Commissioner has filed a Motion for Summary Judgment seeking to uphold the ALJ's decision. The parties have consented to have this Court conduct all proceedings in this case, including an entry of final judgment. 28 U.S.C. § 636(e); N.D. Ill. R. 73.1(c). For the reasons stated below, Plaintiff's motion is granted.

**I. Legal Standard**

**A. The Social Security Administration Standard**

In order to qualify for disability benefits, a claimant must demonstrate that he is disabled. An individual does so by showing that he cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment

which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 4243(d)(1)(A). Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims. *See* 20 C.F.R. § 404.1520. The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. § 404.1520(a)(4)(i). It then determines at Step 2 whether the claimant's physical or mental impairment is severe and meets the twelve-month durational requirement noted above. 20 C.F.R. § 404.1520(a)(4)(ii). At Step 3, the SSA compares the impairment (or combination of impairments) found at Step 2 to a list of impairments identified in the regulations ("the Listings"). The specific criteria that must be met to satisfy a Listing are described in Appendix 1 of the regulations. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a Listing, the individual is considered to be disabled, and the analysis concludes; if a Listing is not met, the analysis proceeds to Step 4. 20 C.F.R. § 404.1520(a)(4)(iii).

Before addressing the fourth step, the SSA must assess a claimant's residual functional capacity ("RFC"), which defines his exertional and non-exertional ability to work. The SSA then determines at the fourth step whether the claimant is able to engage in any of his past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can do so, he is not disabled. *Id.* If the claimant cannot undertake past work, the SSA proceeds to Step 5 to determine whether a substantial number of jobs exist that the claimant can perform in light of his RFC, age, education, and work experience. An individual is not disabled if

he can do work that is available under this standard.  20 C.F.R. § 404.1520(a)(4)(v).

**B.  Standard of Review**

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court.  Judicial review of an ALJ's decision is governed by 42 U.S.C. § 405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts or by making independent credibility determinations.  *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).  Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions.  *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008).  This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review."  *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002).  Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence.  *Elder*, 529 F.3d at 413 (citation omitted).

## II.  Background

**A.  Procedural History**

Ripley disputes for the second time a decision of Administrative Law Judge ("ALJ") Daniel Dadabo.  The ALJ first denied Ripley's application on February 26, 2008.  She

subsequently sought relief in federal court. On February 26, 2010, United States Magistrate Judge Michael Mahoney issued a Report and Recommendation, finding that the Commissioner's decision should be remanded for further proceedings. The District Court adopted the Report.

Judge Mahoney noted numerous errors in the ALJ's decision. These included: (1) the failure to draw a logical bridge between the evidence and the ALJ's conclusion that Plaintiff did not meet or equal a listed impairment; (2) providing an insufficient analysis for giving limited weight to the opinion of Plaintiff's treating physician, Dr. Jennifer Takata; (3) inadequate reasons for assigning "very limited weight" to consulting psychologist, Dr. Barbara Sherman; (4) the lack of a logical bridge linking the record and the RFC determination; (5) incorrectly discounting the records of neurologist Dr. Merrill Reiss; and (6) a misplaced reliance on several medical issues, including a lack of treatment for multiple sclerosis ("MS") and Plaintiff's pregnancy. (R. 548-85).

On remand, additional medical and psychological evaluations were performed by Dr. Robert Prescott and Dr. Norma Villanueva, as noted below. ALJ Dadabo then held a supplemental hearing on February 18, 2011. After taking testimony from medical experts Dr. Hilda Marin and Dr. Kennise Herring, the ALJ issued his decision that once again found Ripley to be not disabled.

### B. Facts

Magistrate Judge Mahoney carefully reviewed the medical records connected with the ALJ's 2008 decision. The Court adopts Judge Mahoney's fact findings and incorporates them as if fully set forth herein. Only newly-obtained medical records are discussed below.

On November 12, 2010, Dr. Robert Prescott conducted a neuropsychological examination of Ripley and applied the Luria-Nebraska Neuropsychological Battery. Dr. Prescott determined that Ripley showed deficiencies in several areas, especially memory, rhythm, and arithmetic scales. Plaintiff also demonstrated difficulties in her short term verbal and non-verbal memory. For example, she was unable to distinguish between geometric figures after a 30 second interval and could not recall words after four reiterations of them. The rhythm scale, which measures attention and concentration, showed that Ripley had difficulty in counting the number of beeps on a tape. She also showed problems in serial 7's and 13's and could not write Roman numerals correctly. In contrast to an earlier observation by psychologist Dr. Bylsma, Dr. Prescott noted that Ripley displayed good effort during her testing. He concluded that Ripley suffered from a cognitive disorder NOS (not otherwise specified) that was related to MS, depressive disorder, and anxiety disorder. (R. 645-49).

On November 23, 2010, Ripley also underwent an examination by internal medicine specialist Dr. Norma Villanueva. After reviewing Ripley's history of headaches, blurred vision, fatigue, and balance problems, Dr. Villanueva confirmed the long-standing conclusion that Plaintiff suffers from multiple sclerosis, migraine headaches, cordiolipid abnormalities, and obesity. A normal range of motion was noted for neck, shoulder, knee, hip, and spinal rotations. Ripley's eye exam showed 20/50 vision in both eyes. (R. 653-61).

Plaintiff also sought follow-up treatment from neurologist Dr. Sailaja Marmareddy after the ALJ first denied her application for benefits. A December 2010 MRI of the brain showed several bilateral cerebral white matter lesions that were compatible with Plaintiff's

prior diagnosis of MS. However, the lesions were less conspicuous than those noted in pre-2008 studies. (R. 671). Dr. Marmareddy stated that Ripley had been non-compliant with her treatment, though she did not elaborate on what this included. A demylinating disorder was again noted. Ripley was found to be experiencing a relapse episode when she saw the neurologist in December 2010. (R. 670).

### C. <u>Hearing Testimony</u>

Ripley appeared at a hearing before ALJ Dadabo on February 18, 2011. She had given birth to three children since the last hearing in 2007 – in sharp contrast to the eight miscarriages that Ripley had earlier experienced. Ripley was 42 years old at the time of the hearing. She lived with her parents, who help care for her children.

Ripley described a typical day as starting with difficulty in getting her legs and arms to move. Performing simple tasks like changing diapers left her "completely zapped." (R. 491). Getting into the shower can take up to half an hour. Ripley described her average level of fatigue as a 7 out of 10. She must take naps every day from one-half to two hours, though Ripley stated that her need for rest varies. She continued to experience blurred vision, which severely restricts her ability to drive on a regular basis. (R. 493). Ripley's vision and other problems improved when she was pregnant. But her condition had deteriorated since she gave birth to her youngest child. (R. 494-96). Ripley stated that one of her doctors had only recently placed her on a new medication that appeared to be helping. (R. 498).

Internal medicine specialist Dr. Martin also testified at the hearing. Dr. Martin thoroughly reviewed Ripley's medical history. She noted that the Topamax that had recently been prescribed for Plaintiff was designed to treat migraine headaches, not MS.

6

Though Dr. Marmareddy's recent records indicated some decreased tactile sensitivity, the general record indicated that Plaintiff's symptoms did not correlate with significant clinical findings. Her symptomology was not inconsistent with the relapsing nature of MS. Dr. Martin found that Ripley had a low probability of experiencing remitting/relapsing or waxing and waning symptoms with her MS. The expert did not believe that MS had been active during most of the claimed disability period. Dr. Martin noted, however, that MS symptoms abate during pregnancy. After considering Ripley's complaints about headaches and blurred vision, Dr. Martin concluded that, excluding all psychological concerns, Ripley had the RFC for light work prior to 2010. She stated that could have changed in light of Dr. Marmareddy's recent report. A number of exertional and non-exertional restrictions were noted as part of the RFC. Dr. Martin concluded that Ripley had severe impairments of MS, obesity, and migraine headaches. None of the conditions met or medically equaled a listed impairment.

Clinical psychologist Dr. Herring also testified at the hearing. Dr. Herring stated that she could not conclude from the prior psychological reports that Ripley suffered from a severe mental impairment during the six years preceding 2010. She noted that Dr. Sherman had been unable to diagnose an Axis I or Axis II condition, meaning that no mental health restriction could be drawn from the report.[1] However, Dr. Herring stressed that she could not comment on why Dr. Sherman did not assign a diagnosis. (R. 539-40). In addition, no Psychiatric Review Technique ("PRT") had been conducted for Plaintiff. Dr. Herring concluded that the mental impairments that Dr. Sherman had noted on her report

---

[1] An Axis I diagnosis refers to clinical disorders. Axis II involves personality disorders. *See Hernandez v. Astrue*, 814 F. Supp.2d 168, 174 n.7 (E.D.N.Y. 2011).

were not clearly tied to a mental health impairment. (R. 528-29). The psychological expert further stated that Dr. Bylsma had not been able to diagnose a psychiatric illness. Dr. Bylsma merely inferred that Ripley was "psychologically more reactive" to things than other people are. (R. 530).

After reviewing Dr. Prescott's more recent report, Dr. Herring stated that Ripley would experience moderate difficulties in maintaining concentration and pace and could not carry out complex instructions. She was unable to make any assumptions about Plaintiff's activities of daily living or social functioning. (R. 532-33). Dr. Herring was unable to state whether or not the anxiety and depression that Dr. Prescott diagnosed in 2010 had been present earlier. (R. 535).

### D.   The ALJ's Decision

ALJ Dadabo applied the familiar five-step evaluation process to find that Ripley was not disabled. The ALJ determined at Step 1 that Plaintiff had engaged in substantial gainful activity after her claimed onset date, and that her disability period began in May 2005.[2] At Step 2, the ALJ concluded that Ripley suffered from the severe impairments of MS with a functional overlay, a cognitive disorder NOS, an anxiety disorder NOS, depression NOS, cervical stenosis, migraine headaches, and obesity. None of these impairments were found at Step 3 to meet or medically equal a listing, either singly or in combination. Before reaching Step 4, the ALJ determined that Ripley was not entirely credible. He also found that she had the RFC to perform sedentary work with a range of exertional and non-exertional limitations. Plaintiff could not perform her past relevant work

---

[2]  Ripley changed her alleged onset date at the hearing to June 1, 2005. The ALJ misstated the date as June 1, 2004. (R. 463, 472).

at Step 4.  Based on the testimony given by a vocational expert, the ALJ determined that jobs existed in the national economy that Plaintiff could perform.  As a result, he concluded that Ripley was not disabled.

## III.  Discussion

Ripley challenges the ALJ's decision on several grounds.  She claims that the ALJ: (1) failed to assess the severity of her mental impairments by means of the "special technique" required by 20 C.F.R. § 404.1520a; (2) did not weigh the treating source opinion of Dr. Takata; (3) did not weigh Dr. Sherman's report; and (4) incorrectly assessed her credibility.  The second and third of these alleged oversights were errors that Judge Mahoney previously identified in his remand order.  In addition, the Court must be mindful of the remaining issues that Judge Mahoney directed the ALJ to consider.  This includes building a logical bridge between the evidence and the ALJ's Step 3 determination.

### A.  Credibility

If an ALJ finds that a medical impairment exists that could be expected to produce a claimant's alleged condition, he must then assess how the individual's symptoms affect his ability to work.  SSR 96-7p.  The fact that a claimant's subjective complaints are not fully substantiated by the record is not a sufficient reason to find that he is not credible. Instead, the ALJ must consider the entire record and "build an accurate and logical bridge from the evidence to his conclusion."  *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). Factors that should be considered include the objective medical evidence, the claimant's daily activities, allegations of pain, any aggravating factors, the types of treatment received, any medications taken, and functional limitations.  *Prochaska v. Barnhart*, 454 F.3d 731,

738 (7th Cir. 2006); *see also* 20 C.F.R. § 404.1529(c)(3); SSR 96-7p. A court reviews an ALJ's credibility decision with deference because "the ALJ is in the best position to determine the credibility of witnesses." *Craft*, 539 F.3d at 678.

The ALJ found that Ripley's allegations were not credible insofar as they conflicted with the RFC. Plaintiff claims that this commonly-used boilerplate language requires remand. It is well-established that such reasoning is insufficient to support a credibility assessment. Remand is only required, however, when the ALJ relies on these formulaic terms without otherwise connecting the credibility assessment to the evidence. *See Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012).

After careful review, the Court finds that is the case here. The ALJ's error stems from several sources. The ALJ found it "notabl[e]" that Ripley conceded that her MS symptoms had abated when she was pregnant and then worsened after her last delivery. This was not a proper ground for discounting her credibility. Ripley had given birth to three children between the 2008 and 2011 decisions. The ALJ himself asked Dr. Martin at the hearing if MS symptoms abated during pregnancy. Dr. Martin confirmed that they did. (R. 518). The fact that Ripley stated that she was better while pregnant is fully consistent with this medical testimony.

The ALJ also overlooked his obligations at the hearing to some degree. He thought that Ripley was less credible because there were treatment gaps between the 2007 and 2011 hearings. (R. 470). A claimant's failure to pursue treatment, or her inconsistent compliance with a doctor's recommendations, can be a basis for finding the claimant's testimony to be less than fully credible. *See* SSR 96-7p. However, such non-compliance must be handled with caution before using it against a claimant. Social Security Ruling 96-

10

7p warns that an ALJ must "not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanation that the individual may provide, or other information in the case record."

ALJ Dadabo did not ask Ripley anything about her treatment gaps in this case. The issue was of special importance because, as just noted, medical evidence suggested that Ripley's MS symptoms may have eased in the interim due to her pregnancies. That could have made treatment less pressing, as her attorney argued to the ALJ. (R. 484). Moreover, the ALJ noted at the hearing that Ripley may not have had access to medical care at times because of insurance problems. (R. 47, 512). The ALJ knew at the latest hearing that Ripley had divorced her husband after he tried to choke her. This could have reduced even further Ripley's access to health insurance. The ALJ did not inquire into her insurance status or her ability to afford healthcare as a possible explanation for treatment gaps. Social Security Ruling 96-7p instructs an ALJ to consider the possibility that an "individual may be unable to afford treatment and may not have access to free or low-cost medical services."

Even more problematically, the ALJ did not explain how the credibility assessment and other parts of his decision took account of the complete record. The regulations are clear that an ALJ must address a claimant's credibility based on the entire record. *See* SSR 96-7p ("When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements."). The administrative record in this case consists of medical reports, tests, and the transcripts of two hearings that were the basis of the earlier decision

that Judge Mahoney ordered the ALJ to reconsider.  It also contains the 2010 post-remand evidence discussed above, including a third hearing.  All were important documents for the ALJ's ultimate findings.

The Court cannot discern how the ALJ went about considering all of these sources. The decision states that Ripley's testimony at the two pre-remand hearings was incorporated by reference.  (R. 469).  The decision itself, however, does not cite any of Plaintiff's prior statements.  That may be because there was some overlap in what Ripley said at the three hearings.  It may also be because the ALJ did not consider anything other than Ripley's testimony at the last hearing.  That is the position the ALJ took at the 2011 hearing.  He told Ripley that "[w]e are going to assume that we have never held a hearing before . . . . so it's as if we're starting from scratch."  (R. 481).  This directly contradicts what the ALJ stated in his decision.  The question remains open, therefore, as to what he actually thought was relevant in assessing credibility.  The ALJ should have clarified whether he relied on Ripley's earlier testimony, or whether he scuttled the prior hearings as he told Ripley and her attorney he was going to do.

It is also unclear how the ALJ considered the pre-remand record, or how he went about assessing Ripley's condition during her alleged disability period.  The relevant period ran from the onset date of June 1, 2005 through the last date insured of December 31, 2009.  However, the decision is based almost entirely on the 2010 post-remand evidence. It does not cite or discuss any of the pre-remand record, other than to discount Dr. Sherman and Dr. Takata and briefly cite Dr. Bylsma.  The ALJ's task was to evaluate Ripley's impairments, including the credibility of her allegations, during the relevant

disability period.[3]

In contrast to the hearing testimony issue, the ALJ did not claim that he was incorporating the fact findings of his prior decision into the new one. The ALJ did state that he was incorporating the fact recitation that Judge Mahoney set out in his remand order. The Court assumes this references pages 551 through 561 of Judge Mahoney's decision. The Commissioner claims that this was appropriate because an ALJ's opinion must be read as a whole. The Court agrees that this rule of construction applies to the four corners of a decision. *See Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004); *Buckhanon ex rel. J.H. v. Astrue*, 368 Fed.Appx. 674, 678 (7th Cir. 2010) ("There is no requirement of such tidy packaging[.]"). It is a very different matter, however, to claim that an ALJ's decision can be "packaged" with a District Court's order remanding an earlier decision. The Commissioner has not submitted any authority for that proposition.

Assuming *arguendo* that the ALJ could do so, he was still obligated to explain how the complete record supported the credibility assessment and other portions of the decision. The ALJ was not wrong to invoke the post-remand evidence to shed light on Ripley's condition. *See Newell v. Comm. of Soc. Sec.*, 347 F.3d 541, 547-48 (7th Cir. 2003) (stating that subsequent diagnoses of an impairment can support a finding of a past

---

[3] Disability claims require a physical or mental impairment that is expected to last for at least 12 months. 42 U.S.C. § 412(d)(1)(A). This period can begin to run from the alleged onset date. SSR 82-52. It can also be established by showing that the impairment arose on or before the last date insured. *See McQuestion v. Astrue*, 629 F. Supp.2d 887, 902 (E.D. Wis. 2009) (citing cases). For purposes of DIB, "[w]hen one loses insured status, one is simply no longer eligible for benefits for disability arising thereafter." *Henley v. Comm. of Soc. Sec.*, 58 F.3d 210, 213 (6th Cir. 1995); *see also Bannister v. Astrue*, 730 F. Supp.2d 946, 951 (S.D. Iowa 2010) ("A claimant must establish disability prior to the expiration of her insurance to qualify for [DIB].").

impairment even if uncorroborated by contemporaneous medical records); *Halvorsen v. Heckler*, 743 F.2d 1221, 1225 (7th Cir. 1984) ("[M]edical evidence from a time subsequent period is relevant to a determination of a claimant's condition during that period."). The critical question is how this later medical evidence fits with the earlier records to show what Ripley's condition was during the alleged disability period of 2005 through 2009.

The ALJ did not explain how he considered the pre- and post-remand evidence in tandem with one another to reach his credibility finding. Perhaps the ALJ thought that he did not need to cite the earlier evidence because Judge Mahoney remanded the case on RFC issues, not credibility. That takes an overly-narrow view of the remand order. Ripley disputed the ALJ's earlier credibility finding on two grounds: (1) the ALJ's reliance on her wish to become pregnant, and (2) his belief that she had not taken MS medication.[4] Judge Mahoney agreed with her on both points. He also found serious fault with the ALJ's assessments of Dr. Sherman, Dr. Takata, and Dr. Reiss. In addition, the ALJ's prior reliance on the testifying experts Dr. Rozenfeld and Dr. Jilhewar no longer applied to the new decision. The controlling weight the ALJ earlier assigned to Dr. Bylsma was erroneous as a matter of law, as discussed below. With very large portions of the earlier medical expert testimony and opinions either set aside or requiring a new assessment, the ALJ should have known that he needed to explain how he considered the earlier record in the new decision.

The ALJ's only clear reference to Ripley's pre-remand condition noted that Dr. Martin testified that MS relapses were not well-documented in the treatment record, and

---

[4] The ALJ's new decision fails to take account of Judge Mahoney's finding that Ripely was prescribed medication for her MS.

that the evidence showed that Ripley's past headaches were managed with medication. (R. 469). This fails to address Ripley's allegations concerning her headaches properly. The record is filled with complaints of migraine headaches. The ALJ did not consider any of Plaintiff's statements on this important issue. He also overlooked most of her treatment records and the medications that had been prescribed to treat her migraines. *See* SSR 96-7p (requiring an ALJ to consider each of these factors). This included the recent prescription of Topamax that Dr. Martin discussed at the hearing.

The ALJ doubted Ripley's credibility based on Dr. Martin's conclusion that headaches would not pose a future problem because her medications had been effective in the past. (R. 469). This reasoning does not build a bridge between the evidence and the ALJ's credibility finding. The ALJ was required to explain why, if Ripley's past medications were proof that she had no serious limitations, she continued to need treatment for migraine headaches. Plaintiff's complaints persisted notwithstanding the medications she was prescribed. Even Dr. Martin indicated that Ripley's complaints continued over the years despite her medications.

The record fully supports that conclusion. Dr. Takata stated in March 2006 that Ripley experienced headaches once a month. Dr. Reiss noted headaches lasting two weeks. These complaints also persisted after the earlier remand in 2008. Dr. Villanueva diagnosed Ripley's with migraine headaches in 2010. The ALJ even took note that Ripley told Dr. Villanueva that her headaches lasted for days and required her to be in a dark room. Notwithstanding, he gave no explanation as to why these complaints were not credible.

The ALJ discounted the seriousness of Ripley's allegations because Dr.

Maramreddy, who noted that Ripley experienced headaches five days a week, did not state that Plaintiff could not work due to her migraines. (R. 470). The ALJ's reliance on this line of reasoning was misplaced. The ALJ would have been required to set aside such a claim even if Dr. Maramreddy had made it. The question of whether a claimant's impairments render her disabled cannot be given any particular weight because they involve issues reserved to the Commissioner. 20 C.F.R. § 404.1527(e).

The ALJ's credibility discussion also overlooked Ripley's allegations of fatigue. One of her primary complaints was that she suffers from relentless fatigue that requires her to nap daily, take many breaks during her activities, and leaves her exhausted when she undertakes minimal tasks like bathing. The record is replete with these complaints, which she made on numerous occasions to her doctors. She also stated at the hearing that her fatigue level was 7 on a scale of 10. Judge Mahoney criticized the ALJ's earlier decision on this issue because the ALJ incorrectly relied on the medical expert's testimony without linking it to the evidence of fatigue in the record. (R. 575).

The ALJ's current discussion has not remedied this shortcoming. The ALJ did take note of some of Ripley's statements on the issue. But his decision fails to review any part of the record related to her many complaints of severe, ongoing fatigue. The only references to the issue involved post-2010 evidence from Dr. Villanueva, Dr. Marmareddy, and a brief portion of Dr. Martin's testimony. The ALJ concluded without explanation that these experts showed that Ripley did not suffer from "reproducible fatigue." (R. 468).

This comment fails to provide an adequate explanation of why Ripley was not credible. "Reproducible fatigue" is a factor in deciding if MS meets or equals listing 11.09. The ALJ had good reason to find that Ripley's claims of fatigue were not entirely credible

16

based on her MS condition; Dr. Martin testified that the absence of relapses in MS did not support claims of severe fatigue. However, the ALJ failed to address the fact that Ripley's fatigue did not necessarily stem from MS. Several pieces of evidence suggested that other causes could be present. Dr. Martin told the ALJ that Ripley's symptoms might well be a psychological reaction to her health conditions. The expert noted that Dr. Byslma had earlier stated that Ripley was psychologically more reactive to her physical ailments than most people. Indeed, the ALJ stated in his opinion that Dr. Martin thought that a "functional overlay could be a component" in Ripley's condition. (R. 469). Despite that finding, the ALJ did not ask clinical psychologist Dr. Herring about this issue and did not consider whether fatigue could be a result of this functional overlay. Without doing so, the ALJ did not adequately discuss the credibility of Ripley's allegations on fatigue. Plaintiff's motion is granted on the credibility issue.

### B. The Mental Impairment Issues

When an ALJ finds that a claimant has a severe mental impairment, he must apply the special technique analysis as part of the Step 2 and Step 3 considerations. Briefly stated, the technique requires the ALJ to document the claimant's functioning in four broad areas: activities of daily living, social functioning, concentration and pace, and episodes of decompensation. The regulations instruct an ALJ to determine whether a claimant's limitations in these areas are "none," "mild," "moderate," "marked," or "extreme." 20 C.F.R. § 404.1520a(c)(4).

The ALJ complied with these requirements to some degree. He determined that Ripley had not experienced any episodes of decompensation, and that she did not have "marked" limitations in the remaining three functional areas. The ALJ did not assign

specific degrees of restriction to Ripley's activities of daily living, social functioning, or concentration. (R. 467). That was erroneous. However, the Court does not reverse the ALJ's decision on this narrow ground. Instead, the ALJ is directed to state what specific conclusions he reached on Ripley's areas of functioning in light of the remand that is ordered below.

The more important issues are how the ALJ reached his special technique findings and how he determined the medical equivalence issues at Step 3. The results of the special technique analysis are important at Step 3 in deciding if a mental impairment meets or equals a listing. *See Parini v. Colvin*, 2013 WL 5372344, at *3 (E.D. Wis. Sept. 24, 2013). The problem in this case is that the ALJ failed to explain adequately how he moved from the evidence in the record to his overall assessment of Ripley's mental impairments under listings 12.02 (organic mental disorders), 12.04 (affective disorders), and 12.06 (anxiety related disorders). Each of these listings can require an assessment of the special technique's functional areas.

An ALJ must satisfy three requirements when addressing a listing at Step 3. The listing under consideration should be identified by name. The ALJ must also consider a medical expert's opinion on the listing issues because they involve medical judgments. *Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004) (citation omitted). "[L]ongstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge or the Appeals Council must be received into the record as expert opinion evidence and given appropriate weight." SSR 96-6p. Third, the ALJ is required to provide an analysis of the listing issues that is "more than . . . perfunctory." *Barnett*, 381 F.3d at 668.

This obligates an ALJ to account for the fact that the composite impact of a claimant's limitations could be greater than the limitations that stem from each impairment singly. He must consider the aggregate effects of a claimant's impairments at Step 3. *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008).

The ALJ did not give any explanation of how he concluded that the combined effect of Ripley's impairments, both physical and mental, did not meet or equal a listing. No medical expert gave an opinion on the aggregate impact of Ripley's mental and physical conditions. Dr. Martin stated at the hearing that Ripley's physical impairments did not meet or equal a listing. She did not discuss Plaintiff's mental restrictions. As the ALJ noted, Dr. Martin was "not taking any point of view as far as [Ripley's] psychological conditions." (R. 515). On the other hand, Dr. Herring considered the psychological issues but did not address Ripley's physical conditions. The record does not contain any expert medical assessment that considered all of the physical and mental impairments that the ALJ believed existed. This left the ALJ without the medical evidence required by the regulations and SSR 96-6p to make his Step 3 finding. His only comment was the boilerplate statement that Ripley's combined impairments did not meet or equal a listing. This perfunctory remark does not build a logical bridge from the record to the Step 3 decision.

As for the mental impairments themselves, the Court is unable to discern the basis of the ALJ's reasoning. Dr. Herring testified that Ripley's mental restrictions did not meet or equal a listing. (R. 535). The ALJ did not take note of that fact or identify listings 12.04 and 12.06. Even if he had, the ALJ would have been required to explain how Dr. Herring's testimony supported the Step 3 conclusion. The psychological expert's testimony was

based on very narrow grounds. Dr. Herring only stated that Ripley's condition did not meet or equal a listing at the time that Dr. Prescott evaluated her in 2010. But Dr. Herring made clear that she could not say whether Ripley suffered from a mental impairment during the prior six-year period. (R. 535, "I cannot tell you with any degree of certainty that these three conditions have been present over the last six years. I accept fully that they were present when Dr. Prescott saw her."). By definition, that means that Dr. Herring did not provide an opinion on whether listing 12.02, 12.04 or 12.06 were met or equaled at any time prior to Dr. Prescott's 2010 evaluation. No other medical expert addressed this issue. That left the ALJ once again without a medical opinion to support his conclusion that Ripley's severe mental impairments did not meet a listing from June 2005 through the end of the relevant period.

The Court is also unable to follow the ALJ's reasoning that supported his findings on Ripley's functional limitations. Listings 12.02, 12.04, and 12.06 all reference the Paragraph B criteria concerning daily living, concentration, and social functioning. The ALJ briefly addressed these functional areas in his special technique assessment. His abbreviated discussion of these issues does not tie the record to the ALJ's (unstated) conclusions on Ripley's functional limitations.

The ALJ did not address social functioning at all. He only stated that Dr. Prescott's test results in 2010 suggested that marked restrictions in social functioning had not "persisted." (R. 467). This suggests that Ripley previously had such restrictions, but that they had resolved by the time Dr. Prescott examined her in 2010. If that is what the ALJ meant, he should have noted that the relevant time period for assessing social functioning began in June 2005. Insofar as the ALJ intended to cite Dr. Prescott as support for his

conclusion on social functioning, the ALJ was required to explain how he did so when Dr. Prescott never assessed Ripley's social functioning. Dr. Prescott merely re-stated some comments that she made to him as part of the interview that he had with her. The Court finds that the ALJ failed to build a bridge between the evidence and his conclusion in the absence of any discussion concerning social functioning.

As for daily functioning, the ALJ briefly noted that Ripley told Dr. Prescott that she could drive, use public transportation, and care for her family. That was inadequate. The ALJ was aware that Plaintiff had stated at the hearing that her ability to do these things was far more limited than Dr. Prescott's version of her comments suggested. She claimed, for example, that she was only able to drive once a week at most, did not drive for weeks during some periods, was exhausted after doing simple tasks for her children, and received help from her extended family. (R. 493). The ALJ did not address these issues in his credibility analysis. His only discussion in the decision was to note that Ripley could drive when her vision was clear and that her mother helped with the children during the day. (R. 469). That merely repeats what Ripely herself stated at the hearing. It does not reconcile the contradictions between Ripley's testimony and Dr. Prescott's second-hand version of what she told him.

The ALJ may have thought that he was relying on Dr. Herring's testimony to reach his conclusions on the Paragraph B issues, though he did not cite it directly. He stated, for example, that Dr. Herring testified that Ripley only had "mild" functional limitations. That does not accurately account for Dr. Herring's actual statements. Dr. Herring thought that Ripley had "moderate" limitations in her concentration. The expert never addressed daily activities or social functioning. In fact, she told the ALJ that she could not "make any

assumptions about [Plaintiff's] activities of daily living, or her social functioning." (R. 533). That is not evidence that Ripley had minimal, moderate, or serious limitations. The ALJ was not entitled to move from either Dr. Prescott's report or Dr. Herring's testimony to evaluate the Paragraph B criteria without explaining what evidence he relied on and how he reached his decision. Plaintiff's motion is granted on this issue.

## C. The Medical Source Opinions

An ALJ is required to evaluate every medical opinion in the record. 20 C.F.R. § 404.1527(d). *See Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) ("Weighing conflicting evidence from medical experts . . . is exactly what the ALJ is required to do."). The regulations lay out six factors an ALJ should consider as part of this analysis, including the nature and length of the treatment relationship, the medical expert's specialization, and the degree to which a source's opinion is supported by other evidence. 20 C.F.R. § 404.1527(d)(1)-(6). The ALJ must clearly state the weight he has given to the medical sources and the reasons that support the decision. *See Ridinger v. Astrue*, 589 F. Supp.2d 995, 1006 (N.D. Ill. 2008).

### 1. Dr. Barbara Sherman

The ALJ assigned limited weight in his prior decision to the report issued by clinical psychologist Dr. Barbara Sherman. Dr. Sherman's report was of special importance to Plaintiff because it found that she had marked restrictions in her ability to interact with the public and co-workers. It also contained an important evaluation of Ripley's mental ability to perform work-related activities. Judge Mahoney found that the ALJ's assessment was erroneous on several grounds: the ALJ incorrectly found the report to be internally

inconsistent; improperly relied on the fact that Dr. Sherman did not provide a DSM-IV Axis 1 or Axis II diagnosis; and erred by relying on Dr. Sherman's statement that she "was prepared to afford [deference to a] neuropsychological evaluation." (R. 572-73).

The ALJ's current consideration of Dr. Sherman falls short once again. The ALJ failed to assign any specific weight to Dr. Sherman's report despite the District Court's order to reconsider the issue. That was erroneous in itself. *See David v. Barnhart*, 446 F. Supp.2d 860, 871 (N.D. Ill. 2006) ("The weight given to a . . . physician cannot be implied[.]"). He also failed to address Judge Mahoney's directive to reconsider the internal consistency of Dr. Sherman's report.

The ALJ relied heavily in his new decision on the assumption that Dr. Herring had testified that "Dr. Sherman's evaluation rested substantially on [a] subjective report, and therefore, was medically less reliable as far as preferred sources of medical objectivity." (R. 469). This misstates Dr. Herring's testimony. The record contains two comments that connect Dr. Sherman's report with Ripley's subjective reports of her condition. In the first, the ALJ himself interpreted Dr. Herring's testimony to be that Dr. Sherman had incorrectly "deferred to [a] subjective account" instead of using standardized testing. Dr. Herring's only remark was "I read everything you read." (R. 527). This response does not support the claim that the ALJ attributed to her in the decision.

In the second statement, Dr. Herring noted that both Dr. Sherman's and Dr. Prescott's reports "accepted the claimant's self report and reviewed the materials from neurological consultations." (R. 525). The Court is unable to follow the logic of the ALJ's reliance on this statement. Dr. Herring included both Dr. Sherman and Dr. Prescott in her comment. Yet the ALJ accepted Dr. Prescott's conclusions but rejected Dr. Sherman's.

23

He could not do so based on "subjectivity" without explaining why it posed no problem to giving substantial weight to Dr. Prescott but undermined Dr. Sherman. The ALJ appears to have believed that Dr. Prescott's findings were more reliable because he applied the Luria-Nebraska test. But that test only supported Dr. Prescott's diagnosis of cognitive disorder. His report does not suggest that the diagnoses of depression or anxiety were based on anything other than the same interpersonal interview technique that Dr. Sherman used.

The ALJ should have recognized that a clinical psychologist like Dr. Sherman might not ordinarily use the testing methods that a neuropsychologist like Dr. Prescott does when examining an individual.[5] The regulations define a neuropsychological evaluation as an "assessment of cerebral dominance, basic sensation and perception, motor speed and coordination, attention and concentration, visual-motor function, memory across verbal and visual modalities, receptive and expressive speech, higher-order linguistic operations, problem-solving, abstraction ability, and general intelligence." 20 C.F.R. Pt. 404, Subpt. P, App. 1 at § 12.00D(8). *See Sanchez v. Barnhart*, 467 F.3d 1081, 1083 (7th Cir. 2006) ("Neuropsychology is the branch of psychology that specializes in the study of the effect of the brain on psychological phenomena."). The regulations require a neuropsychologist to apply objective tests like the Luria-Nebraska assessment. 20 C.F.R. Pt. 404, Subpt. P, App. 1 at § 12.00D(8). The same requirement does not apply to a non-neuropsychological assessment of mental impairments. *See id*. at § 12.00D(4).

---

[5] Clinical psychologist Dr. Herring emphasized the issue at the hearing by stating, "I'm not a neuropsychologist, and I need to be very clear about that." (R. 529). Dr. Herring also testified that she was not trained to comment on the significance of the Luria-Nebraska scores that Dr. Prescott had evaluated.

The Court finds that the ALJ's reliance on the subjective nature of Dr. Sherman's methodology was misplaced. The regulations reject the position that objective tests are *per se* requirements for evaluating mental impairments. The listings state that mental conditions are evaluated by medical evidence that includes a claimant's "symptoms." 20 C.F.R. Pt. 404, Subpt. P, App. 1 at § 12.00B. Symptoms are defined as "your own description of your physical or medical impairment(s)." *Id.* An objective test is not automatically required to evaluate such descriptions because they are subjective by definition.

The Commissioner's defense of the ALJ's decision overlooks that many courts have rejected the position that "objective" tests are always necessary when considering mental impairments:

> The accepted clinical technique for diagnosing a mental impairment is to assess the existence and severity of symptoms and signs identified by the American Psychiatric Association in the Diagnostic and Statistical Manual of Mental Disorders. . . . *This assessment is usually based on a patient's subjective reports and the [psychiatrist's] own observations.* The regulations specify that a psychiatric opinion may rest either on observed signs and symptoms or on psychological tests.

*Huskey v. Astrue*, 2007 WL 2042504, at *6 (D. Kan. July 5, 2007) (internal quotes and citation omitted) (emphasis added). *See also Schwarz v. Barnhart*, 70 Fed.Appx. 512, 518 (10th Cir. 2003) (rejecting a strict need for objective testing); *Garcia v. Comm. of Soc. Sec.*, 496 F. Supp.2d 235, 242 (E.D.N.Y. 2007); *Browning v. Astrue*, 2010 WL 3730172, at *13 (D.S.C. July 30, 2010). The ALJ should have explained the basis of his reasoning with greater care if he thought that this case demanded something more than the accepted techniques that Dr. Sherman used.

The ALJ also discounted Dr. Sherman on the ground that she did not make an Axis I or Axis II diagnosis. This overlooks that Judge Mahoney previously rejected similar reasoning, stating that the fact that Dr. Sherman did not make "a DSM-IV diagnosis is not enough to discount the rest of the doctor's opinion." (R. 573). In part, that was because Judge Mahoney concluded that Dr. Sherman's deferral of an Axis II diagnosis did not have any effect on her conclusion that Ripley had marked limitations in other areas of functioning. He noted, for example, that Dr. Sherman only stated that a neuropsychological evaluation would clarify "whether any *other* capabilities were affected by Claimant's impairment." (R. 573) (emphasis in original). The ALJ appears to have relied on Dr. Herring's testimony on the Axis I and Axis II issues to justify his decision. But the ALJ did not discuss what Dr. Herring actually said; he merely noted in passing that Dr. Herring had stated that there was not "much to work with." (R. 469-70).

This does not explain the ALJ's reason for ignoring Judge Mahoney's earlier comments concerning the fact that Dr. Sherman *did* make specific findings. No inference is necessary to see that she found a range of moderate limitations in Ripley's cognitive understanding, as well as marked restrictions in interacting with others. (R. 436-37). The ALJ did not explain why he believed he could disregard Judge Mahoney's criticism of the ALJ's rejection of Dr. Sherman's report in its entirety. An expert's report can be given greater weight on some issues that on others. *See McMurtry v. Astrue*, 749 F. Supp.2d 875, 888 (E.D. Wis. 2010) (stating that a medical expert's report can be given different weight on different points raised in the opinion). More careful consideration might have led the ALJ to conclude than some of Dr. Sherman's findings could not be set aside as easily as the ALJ thought they could. The problem is that the ALJ did not adequately address

26

why Dr. Herring's testimony allowed him to dismiss all of Dr. Sherman's report so easily.

Finally, the ALJ contrasted Dr. Sherman's findings to those of Dr. Bylsma, though the basis of his reasoning is difficult to follow. Dr. Bylsma concluded in 2007 that Ripely did not have a mental impairment. (R. 470). The ALJ should restate his grounds for invoking Dr. Bylsma. Dr. Bylsma's finding contradicts the ALJ's own conclusion that Ripley suffers from the severe impairment of depression, anxiety, and cognitive disorder. The ALJ may have believed that these conditions only arose after Dr. Bylsma's 2007 assessment, as discussed earlier. Without clarification, however, it is difficult to discern how the ALJ evaluated Dr. Bylsma and relied on it to reach his decision.[6]

The Court notes that the ALJ did not give any specific weight to Dr. Bylsma or state why Dr. Bylsma was more credible than Dr. Sherman. Certainly, the ALJ could not have relied on the fact that he previously assigned "controlling" weight to Dr. Bylsma. In addition to the Appeals Council's order vacating the prior decision, the ALJ's earlier assessment was erroneous as a matter of law. Controlling weight may only be given to a claimant's treating physician. SSR 96-2p. An examining physician like Dr. Bylsma does not qualify as a treating physician. *White v. Barnhart*, 415 F.3d 654, 658 (7th Cir. 2005) (citing 20 C.F.R. § 404.1502); *Simms v. Astrue*, 599 F. Supp.2d 988, 1001 (N.D. Ind. 2009). The

---

[6] The ALJ found at Step 2 that Ripley suffered from the severe impairments of a cognitive disorder, depression, and anxiety. The only diagnosis for these conditions was Dr. Prescott's November 12, 2010 evaluation. The ALJ gave no indication of how he decided that these disorders were present during the disability period. He cited with approval Dr. Bylsma's 2007 finding that Ripley did not have a mental impairment. (R. 470). That suggests that the ALJ believed that the depression and anxiety arose at some later date. But Dr. Prescott did not say when they began, and Dr. Herring had no opinion at all. The ALJ should clarify this issue on remand.

ALJ shall clarify the basis of his reliance on Dr. Bylsma on remand.[7]

### 2. **Dr. Jennifer Takata**

A treating physician's opinion is entitled to controlling weight when it is supported by substantial evidence. When it is not, such opinions "are still entitled to deference and must be weighed using all of the factors provided in [the regulations]." SSR 96-2p. *See also Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) ("If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion.").

Plaintiff argues that the ALJ erred by failing to assign a specific weight to Dr. Takata. The Court only addresses this issue briefly, as this case already requires remand on other grounds. The ALJ must give a definite weight to Dr. Takata's opinion and state his reasons for doing so more clearly. He discounted Dr. Takata, in part, because she did not "renew" her earlier opinion. The Court sees no clear reason why she was required to do so. Dr. Takata may not have continued to treat Ripley, or Ripley may not have requested a new opinion. The ALJ had no information on this issue because he did not ask about it at the hearing.

The Commissioner claims that the ALJ properly relied on the testimony of the non-

---

[7] The ALJ should further consider that Dr. Sherman's conclusions were consistent, at least to some degree, with the record. Dr. Prescott concluded that Ripley had limitations in memory and concentration. That appears to be largely what Dr. Sherman found by stating that Ripley had moderate restrictions in her ability to understand and carry out complex instructions. (R. 436). Dr. Sherman's findings were also consistent on this issue with Dr. Herring's statement that Ripley had moderate restrictions in her concentration.

treating expert Dr. Martin to discount some of Dr. Takata's findings. That is not entirely persuasive. Dr. Martin did criticize Dr. Takata. An ALJ can also give greater weight to a reviewing physician than to a treating one. *But see Criner v. Barnhart*, 208 F. Supp.2d 937, 954 (N.D. Ill. 2002) ("The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician.") (internal quote and citation omitted). The ALJ's reasoning was that Dr. Takata's opinion had "not found resonating support" in the post-remand evidence. This fails to explain if support could be found in the pre-remand evidence. Dr. Takata's opinions were given in 2006, four years prior to the evidence the ALJ relied on to discount them. The ALJ was required to explain more fully how he could assess Dr. Takata based solely on post-remand evidence. The Court notes in this regard that Dr. Martin did not comment on Dr. Takata directly. The ALJ relied entirely on his own reasoning derived from the post-2010 records. He must state his logic more fully, state a specific weight given to Dr. Takata, and  and build a bridge from all the evidence to that finding.

## IV.  Conclusion

For these reasons, Plaintiff's Motion for Judgment on the Pleadings [20] is granted. The Commissioner's Motion for Summary Judgment [22] is denied.  The ALJ's decision is reversed, and this case is remanded to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.  It is so ordered.

**ENTERED:**

_Daniel G. Martin_
_____
**DANIEL G. MARTIN**
**United States Magistrate Judge**

Dated: June 2, 2014